UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

     v.                                    MAGISTRATE JUDGE NO.
                                            10-00865-MBB

SEBASTIAN J. SNOW,
     Defendant.

**MEMORANDUM AND ORDER RE:**
**MOTION TO SUPPRESS AS TO SEBASTIAN SNOW**
**(DOCKET ENTRY # 7)**

**August 5, 2010**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to suppress the evidence derived from a stop of defendant Sebastian J. Snow's ("defendant") vehicle by Park Ranger David LaMere ("LaMere") on July 2, 2009. (Docket Entry # 7). The events leading up to and including the stop happened in and just outside the Boston National Historic Park, specifically an area known as the Charlestown Navy Yard[1] ("the Park"). (Docket Entry ## 7 & 8).

Having reviewed the papers, listened to argument at the April 30, 2010, motion hearing and considered the testimony and argument at the June 10, 2010, evidentiary hearing, this court finds that LaMere conducted: (1) an investigation of a traffic violation pursuant to 16 U.S.C. § 1a-6(b)(3); (2) a $\underline{Terry}$[2] stop to investigate the possibility of defendant's operation under the

---

[1] The Charlestown Navy Yard is part of the Boston National Historical Park. See 16 U.S.C. § 410z.

[2] $\underline{Terry\ v.\ Ohio}$, 392 U.S. 1 (1968).

influence of alcohol; and (3) an unlawful arrest of defendant for operating under the influence.  Under the circumstances the probable cause arrest was reasonable.

## PROCEDURAL BACKGROUND

Violation Numbers 1379111, 1379112 and 1379113, respectively charging defendant with failure to comply with a traffic control device (36 C.F.R. § 4.12), operating under the influence (36 C.F.R. § 4.23(a)(1)) and refusal to submit to a chemical test (36 C.F.R. § 4.23(c), were filed on February 12, 2010.  (Docket Entry # 1).  On April 15, 2010, defendant filed the above styled motion to suppress (Docket Entry # 7) which the United States of America ("the Government") opposes (Docket Entry # 8).

This court heard argument at the April 30, 2010, motion hearing.  On May 21, 2010, this court ordered an evidentiary hearing to evaluate whether and at what time a formal arrest, or restraint of a degree associated with an arrest, took place.  An evidentiary hearing was held on June 10, 2010.  The Government called one witness and the defendant did not call any witnesses.

## FACTUAL BACKGROUND[3]

During the early hours of July 2, 2009, LaMere was parked

---

[3]  The factual record for this motion is comprised of:  (1) the statements of probable cause in the citations (Docket Entry # 1) which were made under the penalty of perjury by LaMere on July 2, 2009; and (2) the sworn testimony of LaMere at the audio recorded June 10, 2010, evidentiary hearing.

within the Park's boundaries on Baxter Road.  LaMere observed "a gray Jeep grand cherokee traveling west on 1st ave."  (Docket Entry # 1, Violation No. 1379111).  According to LaMere, "the Jeep did not stop for the stop sign at the intersection of 1st ave. and 5th st." (Docket Entry # 1, Violation No. 1379111), an intersection located within the Park.

The vehicle traveled up Fifth Street and then came to a stop at a red light at the intersection of "5th and Chelsea."  (Docket Entry # 1, Violation No. 1379112).  "The driver . . . did not respond when the light turned green, remaining stopped at the intersection for several seconds."  (Docket Entry # 1, Violation No. 1379112).  LaMere followed after the vehicle.  After the vehicle turned left onto Chelsea Street, outside the boundaries of the Park, LaMere activated the blue lights on his police cruiser.  (Docket Entry # 1, Violation No. 1379112).  LaMere testified that he did not activate his cruiser lights on Fifth Street because it is a dangerous location to conduct a traffic stop.

The driver, later identified as defendant, did not stop the vehicle for approximately two blocks.  LaMere approached the vehicle on the driver's side.  LaMere observed that defendant was smoking a cigarette.  LaMere then explained his reason for the stop, asked defendant why he had failed to stop for the stop sign and requested defendant's driver's license and registration.

3

Defendant explained that he was looking for his cell phone when he went through the stop sign.  Defendant's speech was not slurred.  Defendant had no difficulty retrieving his driver's license or the registration.  LaMere testified that defendant was polite.

LaMere returned to his cruiser and ran defendant's information.  When LaMere returned to defendant's vehicle, defendant was no longer smoking a cigarette.  LaMere observed that defendant "had a flushed complexion and watery eyes." (Docket Entry # 1, Violation No. 1379112).  LaMere did not inquire as to why defendant's eyes might be watery.  Also, LaMere had never met defendant before.

LaMere then observed the strong smell of an alcoholic beverage coming from the vehicle.  LaMere asked defendant if he would step out of the vehicle and perform "standard field sobriety tests."  (Docket Entry # 1, Violation No. 1379112). Defendant had no difficulty exiting the vehicle.  "When [defendant] exited the Jeep [LaMere] observed the strong odor of an alcoholic beverage on his person."  (Docket Entry # 1, Violation No. 1379112).  LaMere noticed that defendant's shirt was untucked and very wrinkled.

LaMere observed that defendant "exhibited several signs of impairment during field sobriety tests."  (Docket Entry # 1, Violation No. 1379112).  Following the tests he contacted Park

4

Ranger Ryan Wright ("Wright") for assistance.  LaMere placed handcuffs on defendant, put him in the cruiser and drove him back to the prisoner processing area, Building 109.  Defendant was not provided with a <u>Miranda</u>[4] warning.  Wright remained on the scene to effectuate the towing of defendant's vehicle.

At the prisoner processing area, defendant was told for the first time that he was under arrest.  LaMere read defendant a sheet concerning waiver of defendant's right to an immediate initial appearance before a magistrate judge.  Defendant signed that waiver.  Next, LaMere read defendant a sheet about submitting to a chemical test and the consequences of refusing to submit.  Defendant refused to submit and did not sign the sheet.

Throughout the course of the early morning, LaMere did not take defendant's statement or interrogate him in any way other than by asking for identifying information as part of processing.  Approximately 90 minutes after the vehicle stop defendant was released to a sober adult.

## DISCUSSION

Defendant moves to "suppress evidence derived from a stop of his vehicle because it violated Defendant's right to be free of unreasonable searches and seizures under the Fourth Amendment." (Docket Entry # 7).  Defendant makes the unsupported assertion

---

[4]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

that, "Where a stop is initiated solely for a traffic violation
and the stop itself is not on federal grounds, then the stop is a
violation of 4th amendment, unreasonable search and seizure and
the fruits of the stop must be suppressed."  (Docket Entry # 7).
He relies on the limited arrest authority of park rangers
addressed in 16 U.S.C. § 1a-6(b)(1), stating that, "The arrest in
this case is unlawful within the meaning of s1a-6(b)(1)."
(Docket Entry # 7).  He further cites <u>United States v. Atwell</u> for
the propositions that rangers "must have complete understanding
of and respect for the geographical limitations of their
authority" and excluding evidence "serves the purpose of
encouraging law enforcement officers to know the bounds of their
authority."  <u>United States v. Atwell</u>, 470 F.Supp.2d 554, 578
(D.Md. 2007).

The Government opposes defendant's motion with for
overarching arguments:  (1) the extraterritorial stop of
defendant's vehicle was "within the statutorily created law
enforcement powers of the ranger, and was constitutionally
permitted"; (2) "the limited arrest authority is not implicated
in this case because Ranger LaMere did not arrest Snow; he was
temporarily detained under Terry"; (3) even if the detention is
"deemed an arrest," evidence obtained prior to the arrest should
not be suppressed; and (4) even if the detention is "deemed an
arrest," evidence obtained after the arrest "should not be

suppressed because even an unauthorized arrest is not an unreasonable Fourth Amendment seizure on the facts of this case." (Docket Entry # 8).  This court will address the encounter between LaMere and defendant chronologically.

I.  The Initial Vehicle Stop

Under 16 U.S.C. § 1a-6(b), United States Park Rangers may: (1) "make arrests without warrant for any offense against the United States committed in his presence" as long as "such arrests occur within that system or the person to be arrested is fleeing therefrom to avoid arrest," 16 U.S.C. § 1a-6(b)(1); and (2) "conduct investigations of offenses against the United States committed in that system," 16 U.S.C. § 1a-6(b)(3), without any geographic limit to the investigation, see H.Rep. No. 94-1569, 94th Congress, 2nd Session 18; United States v. Smith, 713 F.2d 491, 494 (9th Cir. 1983); United States v. Strasnick, 2008 WL 2389789, *2 (D.Mass. June 10, 2008); United States v. Jones, 428 F.Supp.2d 497, 504 n.5 (W.D.Va. 1996).  Here, pursuant to 16 U.S.C. § 1a-6(b)(3), LaMere followed defendant outside the boundary of the Park to investigate a traffic violation observed within the Park.  LaMere initiated the traffic stop as he rounded his turn off of Fifth Street onto Chelsea Street.  Both LaMere and defendant were outside the territory of the Park.

"The Supreme Court has long viewed the typical traffic stop to 'resemble, in duration and atmosphere, the kind of brief

detention authorized in <u>Terry</u>.'" <u>United States v. Fernandez</u>, 600
F.3d 56, 59 (1st Cir. 2010) (quoting <u>Berkemer v. McCarty</u>, 468
U.S. 420, 439 (1984)).  "Like the reasonable suspicion that
criminal activity is afoot in the <u>Terry</u> context, the detection of
a traffic violation permits officers to effect a limited seizure
of the driver and any passengers consistently with the Fourth
Amendment." <u>Id.</u> (citing <u>Arizona v. Johnson</u>, 129 S.Ct. 781, 788
(2009); <u>see also</u> <u>United States v. Chaney</u>, 584 F.3d 20, 24 (1st
Cir. 2009) ("[a] traffic stop constitutes a seizure . . . and
thus must be supported by reasonable suspicion that a traffic
violation has occurred").  Several courts analyzing 16 U.S.C. §
1a-6(b)(3) have held that, "There is no reason to believe that
Congress intended the park police officers' authority to
investigate be construed so narrowly as to exclude <u>Terry</u> stops."
<u>United States v. Smith</u>, 713 F.2d 491, 494 (9th Cir. 1993); <u>see</u>,
<u>e.g.</u>, <u>United States v. Strasnick</u>, 2008 WL 2389789, *3 (D.Mass.
June 10, 2008) ("[b]ecause Ranger LaMere acted within his
investigative powers pursuant to § 1 a-6(b)(3), for which there
is no geographic limitation, he was authorized to stop Strasnick
outside of the Park to investigate the traffic violation . . .
that occurred inside of the Park"); <u>United States v. Jones</u>, 428
F.Supp.2d 497, 504 n.5 (W.D.Va. 2006) ("Chartier also had the
statutory authority to perform the stop outside the Park under §
1-6(b)(3)").

Here, LaMere witnessed defendant drive through a stop sign on the Park's property.  He had reasonable suspicion, if not probable cause,[5] to effectuate the traffic stop for defendant's failure to comply with a traffic control device on park property. Therefore, LaMere permissibly stopped defendant's vehicle outside the Park for the purpose of investigating the traffic violation and issuing a citation.

## II.   Extension of the Vehicle Stop

Determining the reasonableness of a Terry stop involves a two-step inquiry.  See United States v. Caine, 517 F.Supp.2d 586, 588 (D.Mass. 2007) (citing United States v. Walker, 924 F.2d 1, 3 (1st Cir. 1991)).  "To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau."  United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  That analysis involves looking at

---

[5]   The Supreme Court in Whren v. United States, stated, "the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code" and held that, "[t]hat rendered the stop reasonable under the Fourth Amendment."  Whren v. United States, 517 U.S. 806, 819 (1996). The Court in Whren affirmed the D.C. District Court's holding that, "When a police officer *observes* a traffic violation, his subsequent stop of the vehicle is reasonable because it is supported by probable cause."  United States v. Whren, 53 F.3d 371, 376 (D.D.C. 1995) (emphasis added).  Here, LaMere observed defendant violate the traffic regulations of the Park.

the situation facing LaMere as a whole, see United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987), including "the circumstances originally warranting the stop, informed by what occurred, and what [he] learned, as the stop progressed." United States v. Chhien, 266 F.3d at 6.

As stated above, LaMere had reasonable suspicion, if not probable cause, to stop defendant's vehicle to investigate the observed traffic violation. As LaMere interacted with defendant at his vehicle, LaMere encountered signs that something more than the initial failure to comply violation may have been afoot. "The first part of the [Terry] inquiry is satisfied if [the park ranger] can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

LaMere noticed that defendant had a flushed complexion and glassy eyes. There was a strong smell of alcohol an alcoholic beverage coming from the vehicle. LaMere then permissibly requested that defendant exit the vehicle, see Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment"). LaMere observed that

10

defendant's shirt was untucked and very wrinkled.

A park ranger receives deference to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002).  LaMere concluded he had reasonable suspicion to believe defendant was operating his vehicle under the influence of alcohol within the Park.  This conclusion was reasonable given defendant's visible signs of intoxication and the smell of an alcoholic beverage.  See Terry v. Ohio, 88 U.S. at 21 ("objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

LaMere then conducted a series of field sobriety tests to "quell or confirm [his] suspicions." Klaucke v. Daly, 595 F.3d 20, 25 (1st Cir. 2010).  Conducting field sobriety tests is reasonable under the second step of the Terry analysis where a park ranger has reasonable suspicion that a driver is impaired. See, e.g., United States v. Maher, 454 F.3d 13, 18 n.5 (1st Cir. 2006); Rogala v. District of Columbia, 161 F.3d 44, 52 (D.C.Cir. 1998); United States v. Caine, 517 F.Supp.2d 586, 589-90 (D.Mass. 2007).  At the conclusion of the tests, LaMere determined that defendant was intoxicated while driving in the Park and unable to

safely operate the vehicle.

III.  Arrest

Following the field sobriety tests, defendant was
handcuffed, placed in the back of LaMere's cruiser and driven to
the Park's prisoner processing area.  His car was towed.
According to the Government, defendant "was *detained* as part of
an investigatory Terry stop only as long as necessary in order
that legitimate law enforcement processes could be completed, and
[he] was not subject to a custodial arrest."  (Docket Entry # 8)
(emphasis added).  Defendant contends that he was arrested.
(Docket Entry # 7).  At the June 10, 2010, evidentiary hearing,
LaMere testified that he had "arrested" defendant.  Despite the
Government's argument to the contrary, defendant was arrested.
In coming to that conclusion, this court turns to the second
Terry inquiry, "whether the scope of the investigatory stop was
reasonable under the circumstances."  United States v. Maguire,
359 F.3d 71, 77 (1st Cir. 2004).

A Terry stop to investigate criminal behavior "permits
officers to 'stop and briefly detain a person for investigative
purposes,' . . . and 'diligently pursue[ ] a means of
investigation . . . likely to confirm or dispel their suspicions
quickly.'"  United States v. Trueber, 238 F.3d 79, 91-92 (1st
Cir. 2001) (citing United States v. Sokolow, 490 U.S. 1, 7
(1989)); United States v. Sharpe, 470 U.S. 675, 686 (1985).

12

Here, after conducting the field sobriety tests, LaMere formed the opinion, much as he earlier suspected, that defendant had been operating under the influence within the Park.  What occurred subsequent to the field sobriety tests crossed from a permissible <u>Terry</u> stop into the realm of an arrest.

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests.'"  <u>United States v. Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994).  "In cases regarding the scope of a <u>Terry</u> stop, we examine 'whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."'"  <u>United States v. Maguire</u>, 359 F.3d 71, 77 (1st Cir. 2004).  "[T]he relevant inquiry is how a reasonable [person] in the suspect's shoes would have understood [the] situation." <u>United States v. Ventura</u>, 85 F.3d 708, 711 (1st Cir. 1996).

While the "use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest," their use is one indication that a de facto arrest may have taken place.  <u>See</u> <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 18 (1st Cir. 1998) ("the use of handcuffs, being one of the most recognizable indicia of traditional arrest, 'substantially aggravates the intrusiveness' of a putative <u>Terry</u> stop").  The Government has pointed to no "specific fact or circumstance" that would lead LaMere to

13

reasonably believe that use of restraints "was necessary to carry
out the legitimate purposes of the stop without exposing law
enforcement officers, the public, or the suspect himself to an
undue risk of harm."  United States v. Acosta-Colon, 157 F.3d 9,
19 (1st Cir. 1998) ("generalized statements are inadequate"); cf.
United States v. Meadows, 571 F.3d 131, 141-42 (1st Cir. 2009)
(the Government articulated that the suspect may have been armed,
involved in a domestic dispute earlier in the day and a flight
risk); see United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st
Cir. 2005) ("reasonable safety concerns permeated the [officer's]
decision to use [handcuffs]").  Regardless, defendant was not
merely handcuffed for a period of time and then released; rather,
LaMere additionally relocated defendant to the park ranger's
station.

"A valid investigatory stop can become an unconstitutional
interference with a suspect's Fourth Amendment rights as police
conduct becomes overly intrusive and amounts to an arrest."  Shah
v. J.W. Holloway, 2009 WL 2754406, *9 (D.Mass. Aug. 20, 2009).  A
"well-defined limitation is that a suspect may not be removed to
a police station without his consent."  Shah v. J.W. Holloway,
2009 WL 2754406, *9 (D.Mass. Aug. 20, 2009); see Kaupp v. Texas,
538 U.S. 626, 630 (2003) ("involuntary transport to a police
station for questioning is 'sufficiently like arres[t] to invoke
the traditional rule that arrests may constitutionally be made

14

only on probable cause'"); <u>Dunaway v. New York</u>, 442 U.S. 200,
212-13 (1979) (finding "the detention of petitioner was in
important respects indistinguishable from a traditional arrest"
where "he was . . . transported to a police station, and placed
in an interrogation room"); <u>see</u> <u>also</u> <u>Flowers v. Fiore</u>, 359 F.3d
24, 34 (1st Cir. 2004) (holding that the officers involved "acted
reasonably in dispelling [their] suspicion throughout the
detention" and finding it "noteworthy that the officers never
relocated Flowers to a station house or detention area").

Here, the combination of placing defendant in handcuffs and
transporting him to the park ranger station, not to mention the
towing of defendant's car and LaMere's statements to defendant
that he was under arrest, moves the encounter from a <u>Terry</u> stop
to at least a de facto arrest. A reasonable person would have
understood that he was not free to leave. Furthermore, defendant
was presented with a waiver card which he signed waiving his
right to an immediate initial appearance before a magistrate
judge. It is clear that defendant was arrested.

IV. <u>Suppression</u>

As mentioned earlier, United States Park Rangers may make
warrantless arrests for offenses committed in their presence as
long as such arrests occur within the park system or the person
to be arrested is fleeing therefrom. <u>See</u> 16 U.S.C. § 1a-6(b)(1).
Defendant points out that he "had no knowledge he was being

pursued by the Ranger and no evidence supports a conclusion that he was 'fleeing to avoid arrest.'"  (Docket Entry # 7).  In order to determine whether a suspect is fleeing, district courts look to the location where a pursuing ranger activates his or her cruiser lights.  See United States v. Jones, 428 F.Supp.2d 497, 501 (W.D.Va. 2006) (finding the defendant did not "flee" where the rangers "did not activate their blue lights, thereby initiating the stop, until after they had traveled outside of the Park"); United States v. Fox, 147 F.Supp.2d 1008, 1009 (N.D.Cal. 2001) (the defendant fled where ranger signaled the defendant to pull over by activating lights within the park, but the defendant drove an additional 200 yards outside the park before pulling over).

LaMere testified that he initiated the traffic stop by activating his lights once he and defendant were outside the boundaries of the Park.  Therefore, for purposes of 16 U.S.C. § 1a-6(b)(1), defendant did not flee the Park.  Since the arrest occurred outside the park system and defendant did not flee therefrom, LaMere was without federal statutory authority to make the arrest.

Mindful that "[s]uppression of evidence . . . has always been our last resort, not our first impulse," Hudson v. Michigan, 547 U.S. 586, 591 (2006), the issue before this court is whether the evidence gathered subsequent to the unlawful arrest should be

excluded.  See Wong Sun v. United States, 371 U.S. 471, 483 (1963) ("to make effective the fundamental constitutional guarantees of inviolability of the person . . . this Court held nearly half a century ago that evidence seized during[, and derived from,] an unlawful search could not constitute proof against the victim of the search").  The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect on future unlawful police conduct, rather than a personal constitutional right of the party aggrieved."  United States v. Calandra, 414 U.S. 338, 348 (1974).  "Where 'the exclusionary rule does not result in appreciable deterrence, then . . . its use . . . is unwarranted.'"  Arizona v. Evans, 514 U.S. 1, 10-11 (1995).

The First Circuit has "not resolved whether an arresting officer's lack of authority under state or federal law to conduct an otherwise constitutionally valid arrest constitutes an unreasonable seizure under the Fourth Amendment."  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004) (declining to rule on the issue in favor of deciding the case on non-constitutional grounds).  There is a split in the federal circuits on this issue.  Compare Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974) ("[t]here is significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule

or some other nonconstitutional mandate"); United States v. Jones, 185 F.3d 459, 463 (5th Cir. 1999) (relevant question when considering suppression of evidence is whether officials violated Fourth Amendment and concluding that state law deficiencies in arrest were irrelevant); and United States v. Bell, 54 F.3d 502, 504 (8th Cir. 1995) ("we do not think Fourth Amendment analysis requires reference to an arrest's legality under state law"); with Malone v. County of Suffolk, 968 F.2d 1480, 1482-83 (2nd Cir. 1992) (whether officers have valid authority to arrest pursuant to state law affects the constitutionality of the arrest); Ross v. Neff, 905 F.2d 1349, 1354 (10th Cir. 1990) ("warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause" which is "presumptively unreasonable"); and United States v. Foster, 566 F.Supp. 1403, 1411-12 (D.D.C. 1983) ("concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer").

This court looks to Virginia v. Moore for its historical analysis of "the norms that the Fourth Amendment was meant to preserve." Virginia v. Moore, 553 U.S. 164, 168 (2008). The Court in Moore was "aware of no historical indication that those who ratified the Fourth Amendment understood it as a redundant guarantee of whatever limits on search and seizure legislatures

18

might have enacted." Id. "The immediate object of the Fourth
Amendment was to prohibit the general warrants and writs of
assistance that English judges had employed against the
colonists." Id. (citing Boyd v. United States, 116 U.S. 616,
624-27 (1886)). "That suggests, if anything, that founding-era
citizens were skeptical of using the rules for search and seizure
set by government actors as the index of reasonableness." Id.
Furthermore, "[n]one of the early Fourth Amendment cases that
scholars have identified sought to base a constitutional claim on
a violation of a state or federal statute concerning arrest."
Id. at 169.

The Moore Court found it was not faced with "a case in which
the claimant can point to 'a clear answer [that] existed in 1791
and has been generally adhered to by the traditions of our
society ever since.'" Atwater v. Lago Vista, 532 U.S. 318, 345
(2001). Here, as in Moore, no clear answer exists[6] from our
founding era to determine whether the overstepping of a federal
statute mandating geographic jurisdiction of federal officers
runs afoul of Fourth Amendment protections. "When history has
not provided a conclusive answer, [courts] have analyzed a search
or seizure in light of traditional standards of reasonableness
'by assessing, on the one hand, the degree to which it intrudes

---

[6] This court notes additionally that neither party provides
any argument or analysis regarding an historical interpretation
of the Fourth Amendment.

upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" <u>Virginia v. Moore</u>, 553 U.S. at 171 (quoting <u>Wyoming v. Houghton</u>, 526 U.S. 295, 300 (1999)).  "In a long line of cases, we have said that when an officer has *probable cause* to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable."  <u>Id.</u> at 171 (emphasis added).

"The underlying command of the Fourth Amendment is reasonableness, and the fact that an arrest may have violated a territorial-limitation statute . . . is merely a factor to be considered when deciding whether this constitutional mandate has been followed."  <u>United States v. Jones</u>, 428 F.Supp.2d 497, 503 (W.D.Va. 2006).  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is *probable cause* to believe that a criminal offense has been or is being committed."  <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004) (emphasis added).  Here, LaMere witnessed defendant driving within the Park minutes before conducting the traffic stop. Based on his observations of defendant when he approached the vehicle and the results of the field sobriety tests, LaMere undoubtedly had probable cause to believe that defendant had been operating under the influence within the Park.  <u>See</u>, <u>e.g.</u>, <u>United</u>

States v. Strasnick, 2008 WL 2389789, *4 (D.Mass. June 10, 2008)
("odor of alcohol emanating from the vehicle, her impaired
speech, and the results of the breath test and field sobriety
tests indisputably provided him with probable cause for the OUI
offense").

The totality of the circumstances leading up to and
including the arrest guide this court to the conclusion that
LaMere's seizure of defendant was constitutionally reasonable.
LaMere witnessed a traffic violation within the Park.  He
conducted a valid, albeit extraterritorial, traffic stop of
defendant's vehicle.  Upon reasonable suspicion, LaMere conducted
a further Terry investigation to confirm or dispel whether
defendant had been operating under the influence within the Park.
Following a series of field sobriety tests, LaMere concluded that
defendant was intoxicated and thus had probable cause that
defendant had been operating under the influence within the Park.
LaMere handcuffed defendant and removed him from the scene of the
traffic stop to the park ranger's station.

LaMere did, however, violate the federal statute enumerating
his jurisdiction to make warrantless arrests.  The House Report
on 16 U.S.C. 1a-6(b) succinctly states, "Such arrests may occur
within the system, or while the person to be arrested is fleeing
from the system to avoid arrest."  H.R. REP. 94-1569, *9, 2nd
Sess. 1976.  The report goes on to say, "The Committee intends

21

that the *clear and specific enforcement authority* contained in
this subsection . . . will be implemented by the Secretary to
ensure that law enforcement activities in our National Park
System will continue to be viewed as one function of a broad
program of visitor and resource protection." Id. (emphasis
added).

LaMere's violation of his arrest authority, while clearly
contrary to the specific intent of the federal legislature, does
not convert the otherwise reasonable, probable cause-based arrest
of defendant into an unreasonable one. See United States v.
Caceres, 440 U.S. 741 (1979) (concluding that "evidence obtained
in violation of Internal Revenue Service (IRS) regulations may be
admitted at the criminal trial of a taxpayer" because "none of
respondent's constitutional rights has been violated . . . by the
agency violation of its own regulations"); United States v.
Hensel, 699 F.2d 18, 29 (1st Cir. 1983) ("the fact that an
agency's employees may exceed the scope of a statute's or a
regulation's authority does not automatically make their actions
'unreasonable' either in Fourth Amendment terms or as a matter of
ordinary understanding of reasonableness"). The discretionary
placement of a park boundary line - subject to change by
congressional or perhaps Department of the Interior amendment[7] -

---

[7] The Charlestown Navy Yard geographic area includes: "the
United States Ship Constitution and the *lands generally depicted*
on the map entitled 'Boundary Map: Charlestown Naval

and the legislature's mandate that warrantless arrests by park rangers occur within that boundary, do not control whether a seizure is reasonable or not.  It is akin to a state's choice to regulate the manner in which its officers conduct arrests, which the Supreme Court says goes above and beyond Fourth Amendment protection.  Cf. Virginia v. Moore, 553 U.S. at 176 ("conclud[ing] that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections"); see United States v. Henry, 482 F.3d 27, 32 ("exclusionary rule was not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law").

In sum, LaMere entered the City of Boston pursuant to statutory authority for the purpose of issuing a traffic citation.  While conducting a Terry investigation as a federal officer of the law, he gained probable cause for making an arrest.  That probable cause, despite LaMere's statutory jurisdiction, made it reasonable under the Fourth Amendment. Since there was no unreasonable seizure, suppression is

---

Shipyard--U.S.S. Constitution, Boston National Historical Park', numbered BONA 20,000 and dated March 1974 which shall be on file and available in the offices of the Director of the National Park Service, Department of the Interior, Washington, D.C."  16 U.S.C. § 410z(d) (emphasis added).

unwarranted.  See Herring v. United States, 129 S.Ct. 695, 699
(2009) (exclusionary rule "designed to safeguard Fourth Amendment
rights generally through its deterrent effect").

V.   Commonwealth v. LeBlanc

     Defendant relies on the Massachusetts Supreme Judicial
Court[8] case, Commonwealth v. LeBlanc, for the proposition that an
officer in Massachusetts cannot pursue a driver into the next
town, across the jurisdictional boundary, for non-arrestable
offenses.  See Commonwealth v. LeBlanc, 551 N.E.2d 906, 907-08
(Mass. 1990).  Defendant argues that LaMere followed defendant
outside the Park jurisdiction with the purpose of stopping
defendant for a non-arrestable offense.  Therefore, as the court
in LeBlanc found, the fruit of the invalid stop should be
suppressed.

     This case is factually similar to LeBlanc because in both
cases law enforcement officers pursued vehicles across a
jurisdictional line to make a non-arrestable traffic stop and
discovered the drivers were intoxicated.  LeBlanc is
distinguished from the matter here, however, for the following
reason.

     The LeBlanc court found, "The Legislature has chosen not to

_____

     [8]  It should go without saying that a Massachusetts Supreme
Judicial Court case is not mandatory authority in this court.  At
best it could be persuasive.

provide the police with extraterritorial authority to make stops for traffic violations." Commonwealth v. LeBlanc, 551 N.E.2d at 909.  Here, the contrary is true.  Under 16 U.S.C. § 1a-6(b)(3), the legislature has vested park rangers with the power to investigate offenses outside the territory of a park.  Courts, including in this district, interpret that power to allow extraterritorial traffic stops for traffic violations.  See, e.g., United States v. Smith, 713 F.2d 491, 494 (9th Cir. 1983); United States v. Strasnick, 2008 WL 2389789, *2 (D.Mass. June 10, 2008); United States v. Jones, 428 F.Supp.2d 497, 504 n.5 (W.D.Va. 2006).  Therefore, while the initial stop in LeBlanc was unlawful by statute, thus invalidating the mere presence of the officer in a foreign jurisdiction to begin with, the initial traffic stop conducted by LaMere here was permitted by statute.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's Motion to Suppress (Docket Entry # 7) is **DENIED**.  A status conference will be held on August 24, 2010, at 2:30 pm for purposes of setting down a trial date.

      /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge